# Richmond

## THE WAVERLY FEED COMPANY, INC. v. CANNIE B. HARRELL, ET AL.

December 7, 1942.

Record No. 2570.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*Thomas L. Woodward* and *Frank E. Butler,* for the appellant.

*Denny, Valentine & Davenport, Wellford & Taylor* and *Frank P. Pulley, Jr.,* for the appellees.

GREGORY, J., delivered the opinion of the court.

A suit was instituted by Waverly Feed Company, Inc., against Cannie B. Harrell to compel him to account to the corporation for the proceeds of certain disability payments made to him by the Metropolitan Life Insurance Company under the disability provisions of two life policies. These policies were issued on the life of Mr. Harrell for the benefit of the corporation. The court below held adversely to the contention of the corporation and it appeals.

Mr. Cannie B. Harrell and Mr. Harvey Fleetwood incorporated a business in Waverly, Virginia, under the name of Waverly Feed Company, Inc. Fifty shares of stock were issued as follows: 24 shares to Mr. Harrell, 24 shares to Mr. Fleetwood, and 1 share each to their respective wives. Mr. Fleetwood was president; his wife was vice-president; Mr. Harrell was secretary and treasurer; and they, with Mrs. Harrell, constituted the directors. Mr. Harrell was general manager and actively in charge of the business, at a salary of $150 per month. Mr. Fleetwood was the vice-president of the Bank at Waverly and in charge of the affairs of that institution.

In 1927, the corporation, through Mr. Fleetwood and Mr. Harrell, decided to obtain certain insurance on their respective lives for the benefit of the corporation. One pol-

icy of $5,000 was obtained on the life of Mr. Fleetwood without provision for disability payments, because he could not pass the more rigid physical examination which was required for a policy containing those provisions. Two policies were obtained on the life of Mr. Harrell, one for $5,000 and the other for $10,000, and in both of these policies there were disability provisions which would pay $10 monthly for each $1,000 of insurance (or a total of $150 per month) for disability if it occurred during the life of the policies. Waverly Feed Company, Inc., was designated beneficiary and owner in all of the policies, and entitled to be paid the face amount of the policy or policies in the event of the death of either Mr. Fleetwood or Mr. Harrell, or both of them.

All premiums were paid by the Waverly Feed Company, Inc., including the additional premium for the disability provisions in the policies of the life of Mr. Harrell.

The applications for the policies on the life of Mr. Harrell were signed by the Waverly Feed Company, Inc., by its president, Mr. Fleetwood. The disability benefits in those policies were made payable to the "insured" who was Mr. Harrell.

In April, 1932, Mr. Harrell became totally and permanently disabled within the meaning of the disability provisions in the two policies and became entitled to $150 per month, which was regularly paid him by the Metropolitan Life Insurance Company from the time of his disability to the time of this litigation.

In 1939, Mr. Fleetwood died and the $5,000 policy on his life was paid and applied upon the corporation's indebtedness to the Bank of Waverly. Before his death, Mr. Fleetwood transferred all of his stock certificates to his wife except one share.

The Waverly Feed Company, Inc., owed the Bank of Waverly a considerable sum for many years. It was approximately $9,000, and Mr. Harrell was indorser on this obligation until 1934. Mr. Fleetwood was never an indorser.

Mr. Harrell ceased to be an indorser after the policies of insurance were assigned in 1934 to protect the debt due the bank. When the $5,000 policy on the life of Mr. Fleetwood

was paid and applied to the obligation due the bank, it was reduced to an amount smaller than the cash surrender value of the policies on Mr. Harrell's life which this bank held as collateral.

When application was made to the Metropolitan Life Insurance Company to assign the policies to the Bank of Waverly, Mr. Fleetwood, on behalf of the Waverly Feed Company, Inc., wrote the insurance company requesting permission to make the assignment to secure the debt due the bank, but stated in the letter that it was desired that the disability benefits in the policies be reserved to the assured.

Later, on July 9, 1934, the Waverly Feed Company, Inc., passed the appropriate resolution directing the assignment. The resolution was signed by both Mr. Fleetwood and Mr. Harrell and, in pursuance thereof, the two policies on Mr. Harrell's life were assigned to the bank, but the disability benefits were reserved to the assured. The assignment was executed on behalf of the Waverly Feed Company, Inc., by Mr. Fleetwood, president, and Mrs. Fleetwood, vice-president.

Mr. Fleetwood, before his death, had been in financial straits. He owed the Bank of Waverly and the bank, through its officers and directors, were prodding him for settlement. Some of them had spoken to Mr. Harrell and had requested that he help Mr. Fleetwood. This, Mr. Harrell promised to do. Each month the bank was withholding a part of Mr. Fleetwood's salary and he was paying the bank each month the $50 that Mr. Harrell let him have from the insurance proceeds.

After the disability of Mr. Harrell, Mr. Fleetwood donated more of his time to the business of the Waverly Feed Company, Inc., but he still retained his position at the bank.

During a portion of the time Mr. Fleetwood was paid $80 per month by the Waverly Feed Company, Inc.

Mr. Fleetwood was a careful business man and careful to keep records concerning his personal affairs. Mr. Harrell had little education, took no interest in the books of the cor-

poration, which were left to a bookkeeper, and, though he signed tax returns, he did not understand them.

Mr. Harrell, from the beginning of the disability payments to him in 1932, shared them with Mr. Fleetwood and the Waverly Feed Company, Inc., until the death of Mr. Fleetwood in 1939, and for three months after his death, Mr. Harrell continued to pay the corporation and Mrs. Fleetwood. He distributed the disability payments from 1932 to and including 1938 in this manner: to the Waverly Feed Company, Inc., $4,600; to Mrs. Fleetwood, $3,300; and to himself, $4,200.

Mr. Harrell gave as his reason for giving a portion of the disability payments to the Waverly Feed Company, Inc., the fact that this company owed considerable money, that he was indorser on the notes of the company; that Mr. Fleetwood was not an indorser and that he, Harrell, did not want anything to happen to the company because he was personally liable for its debts. He also explained that he wanted to keep the business a going concern so he would have something to make a living from after his disability ceased. He also stated that he had a nice income. He testified that there was no express agreement between Fleetwood and himself whereby the payments of insurance benefits were divided. They were handled by him alone. He made the division as he liked and in accordance with his idea of what was best for the company.

Mr. Harrell gave as his reason for giving a portion of the disability payments to Mr. Fleetwood the fact that Mr. Fleetwood had been giving considerable time to the company since his (Harrell's) disability and getting nothing for his additional work; that Mr. Fleetwood was hard pressed financially and had asked him (Harrell) to help him out and that the bank officials had also requested that he help Mr. Fleetwood. He also testified that he felt if he could help Mr. Fleetwood by dividing the benefits with him, it would help the Waverly Feed Company, Inc.

The books of the company and the tax returns carried an item of $1,800 as annual income of the company. The ac-

count was styled "Income Disability Insurance". The tax returns were made by a certified accountant and signed by Mr. Harrell as secretary and treasurer. Mr. Harrell stated that he did not know anything about bookkeeping or making tax returns. He said these matters were left entirely to others and that he signed the returns, accepting the report and trusting the expert who was employed each year to make them.

Very soon after the death of Mr. Fleetwood in March 1939, Mr. Harrell talked to Mrs. Fleetwood at her home, and again on Memorial Day. There is great conflict in the testimony of Mr. Harrell and Mrs. Fleetwood as to what he said on these two occasions. He also talked to Mrs. Fleetwood's son and her son-in-law, and there is also conflict in the testimony as to what he said on these occasions. He says that he made three payments to Mrs. Fleetwood after the death of her husband; that she had requested that he do so; that she was in great sorrow on account of the death of her husband; and that her financial circumstances were not good.

Mrs. Fleetwood testified that Mr. Harrell told her that each month $50 was to be paid her and $50 on Mr. Fleetwood's obligation to the bank from the disability payments. She also said that he stated to her that the disability payments came to him as manager of the company, and when Mr. Fleetwood's obligation to the bank was finally paid, she would get $75 per month and he would get the same.

Mrs. Fleetwood's son and son-in-law testified as to their conversations. Their testimony is contradictory of Mr. Harrell.

On Memorial Day, Mrs. Fleetwood and Mr. Harrell had another talk. Mrs. Fleetwood says Mr. Harrell told her that he could no longer pay her the $50 per month because his wife scolded him for doing so and therefore he discontinued the payment.

Mr. Harrell says he did tell Mrs. Fleetwood he would not continue the payments to her. He denied that he had any domestic difficulties about it. After this, he made no other payments to Mrs. Fleetwood.

■ ■ All of the testimony and other evidence was introduced in open court before the chancellor. He heard the witnesses testify, observed their demeanor, and weighed their conflicting statements. The conflicts in the testimony have been settled by him. The case is purely one of fact and unless the decree is plainly wrong, it must stand.

The theory of the complaint is that Mr. Harrell, of his own volition and for his individual advantage, procured the policies and had the corporation pay the premiums, including the additional premiums for the disability benefits, and, therefore, any benefits derived therefrom are held by him as trustee for the corporation.

The complainant attempts to sustain its claim of a trust upon the conduct of the parties in relation to the distribution of the proceeds and upon the alleged admissions of Mr. Harrell to Mrs. Fleetwood and others.

Mr. Harrell stakes his claim upon the insurance contracts which expressly provide that the disability benefits are to be paid to the insured who, of course, is Mr. Harrell.

We are unable to agree with the complainant that this is a case of an officer of a corporation making a contract for his personal benefit by using the funds of the corporation.

These policies were not obtained by Mr. Harrell for his personal benefit. They were obtained by the corporation for its business purposes. It paid the premiums and owned the policies. As an incident of that ownership, it hypothecated them with the bank to secure a debt of the corporation.

Mr. Fleetwood and Mr. Harrell were the real owners of the corporation. It is true their respective wives each held one share of stock, but they held their shares for only formal purposes. All business transactions for the corporation were conducted by Mr. Harrell and Mr. Fleetwood, and as long as those transactions violated no law and invaded the rights of no creditor, they constituted the valid acts of the corporation. When they discussed the advisability of getting the policies, they both wanted the disability provisions, and those provisions would have been made a part of the policy on Mr. Fleetwood's life if he had been able

to pass the required physical examination. There can be no question of their right to obtain policies embracing these benefits. It was their mutual desire and they were the owners of the corporation. The transaction injured no one.

There was no secrecy about the transaction. Mr. Fleetwood signed the application for the insurance and was entirely familiar with it. The $150 per month disability benefit replaced the monthly salary of $150 the corporation had been paying Mr. Harrell. When the assignment of the policies to this bank was made, Mr. Fleetwood not only signed ·the letter to the insurance company for permission to assign the policies to the bank, but he also signed the resolution of the corporation authorizing the assignment. In both the letter and in the resolution there was expressly retained to the insured, Mr. Harrell, the monthly disability benefits. These benefits never passed with the policies to the bank.

The evidence shows beyond any doubt that the purchase of the policies on the life of Mr. Harrell, including the disability benefits, was open, fair, and a *bona fide* transaction of the corporation with which Mr. Fleetwood was thoroughly acquainted. No evidence has been introduced which tends to show that the corporation, prior to Mr. Fleetwood's death in 1939, claimed to own the disability benefits. On the other hand, it is not controverted that Mr. Harrell, from 1932 to this time, has had exclusive control over the funds, using them as he pleased and treating them as his own without any interference from the corporation.

[■ It is true that Mr. Harrell made very substantial donations to the corporation and to Mrs. Fleetwood for several years, but these were not the result of any agreement. He has explained his conduct in this regard and the trial court has accepted his explanation as the true version of what occurred. In like manner, the trial court has accepted his explanation in regard to the tax returns and the account carried on the books of the corporation. In these conclusions of the court we find no fault. The conflict between Mrs. Fleetwood and Mr. Harrell and between her son and son-in-law and Mr. Harrell has been resolved by the court in favor

of Mr. Harrell. We are not justified in disturbing its conclusion in this regard.

The assignments of error directed to the admissibility of certain evidence are without merit.

The decree is affirmed.

*Affirmed.*